

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 7, 2022

<u>**Via ECF**</u>

Honorable Denise L. Cote
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: *United States v. Carlos Robledo-Anez*, S5 19 Cr. 91 (DLC)

Dear Judge Cote:

  The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for June 10, 2022, at 12:00 p.m., on the defendant's convictions of (i) conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Sections 812, 959(a), 959(d), 960(a)(3), 960(b)(1)(B)(ii), and 963; and (ii) importing cocaine into the United States, in violation of Title 21, United States Code, Sections 812, 959(a), 959(d), 960(a)(3), and 960(b)(1)(B)(ii), and Title 18, United States Code, Section 2.

  As described below, the defendant, seeking to capitalize on the DEA's expulsion from Bolivia, made an initial investment that facilitated the shipment of a ten-kilogram sample of cocaine to the United States, and pledged to use his contacts within Bolivia's airspace control agencies to secure the logistics for larger-scale cocaine flights out of Bolivia. Accordingly, the Government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 135 to 168 months' imprisonment is warranted and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case. The Government also submits that the Court should impose a fine within the Guidelines range of $35,000 and $10 million.

## BACKGROUND

### I. Bolivia: A Major Cocaine Production and Transshipment Hub

  In 2006, Evo Morales — a former coca farmer and coca union leader — became Bolivia's first indigenous president.[1] Two years later, in 2008, the Bolivian government expelled the DEA and the State Department following tensions relating to, among other things, U.S. anti-

---

[1] CIA World Factbook: Bolivia, *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/bl.html.

narcotics policies in the region.  Since that time, cocaine traffickers in Bolivia have acted with impunity, increasing cocaine production in-country and also acting as a transit point for cocaine manufactured in Peru, headed toward Brazil and then for international distribution.[2]  Indeed, Bolivia's "position at the heart of South America's drug trade and weak, corrupt security forces [] facilitate Bolivia's role as a key transit nation for narcotics heading to Brazil, Argentina, Europe and Asia."[3]  While most of the cocaine imported into the United States originates in Colombia, Bolivia and Peru also account for the drug's ubiquitous presence in our country.[4]

      Recognizing Bolivia's centrality in the global cocaine supply chain, the United States, in August 2019, identified Bolivia as "a major drug transit or major illicit drug producing" country, along with others such as Colombia, Afghanistan, Venezuela, and Mexico.[5]  The United States further singled out Bolivia, alongside the illegitimate regime of Nicolás Maduro Moros in Venezuela, as failing to adhere to their obligations under international counter-narcotics agreements.[6]  Earlier this year, the U.S. State Department identified Bolivia as the third-largest producer of cocaine in the world, maintaining its position as one of the world's leading cocaine producers.[7]  While the ouster of President Evo Morales in November 2019 has been viewed as a positive step for the country, the Bolivian government and FELCN, its purported anti-narcotics force, remain rife with corruption.  Morales's resignation has reportedly "created a power vacuum"[8] in the country, which is likely to lead to further instability and a continued rise in cocaine production and exports.

---

[2] *See, e.g.*, Wall Street Journal (Nov. 19, 2019): Morales Made Bolivia a Narco State, *available at* https://www.wsj.com/articles/morales-made-bolivia-a-narco-state-11574018858.

[3] InSight Crime: Bolivia Profile, *available at* https://www.insightcrime.org/bolivia-organized-crime-news/bolivia/

[4] Business Insider (Sep. 14, 2017): Here's how drugs are getting smuggled from South America to the US, *available at* https://www.businessinsider.com/heres-how-drugs-are-getting-smuggled-from-south-america-to-the-us-2017-9 ("Much of the cocaine from the region — Colombia, Bolivia, and Peru are the world's biggest producers — travels to the US, plying sea and air routes in the eastern Pacific and Caribbean, as shown by the map below, which was prepared by US Southern Command and displayed at the hearing.").

[5] *See* Memorandum on the Presidential Determination on Major Drug Transit or Major Illicit Drug Producing Countries for Fiscal Year 2020; *available at* https://www.whitehouse.gov/presidential-actions/memorandum-presidential-determination-major-drug-transit-major-illicit-drug-producing-countries-fiscal-year-2020/.

[6] *Id.*

[7] *See, e.g.*, State Department: 2022 International Narcotics Control Strategy Report, *available at* https://www.state.gov/2022-incsr-volume-i-drug-and-chemical-control-as-submitted-to-congress/ ("Colombia, Peru, and Bolivia are the first, second, and third largest cocaine source countries in the world, continuing an established trend.").

[8] Washington Post (Nov. 13, 2019): How Evo Morales Fell and Plunged Bolivia Into Chaos, *available at* https://www.washingtonpost.com/business/energy/how-evo-morales-fell-and-plunged-bolivia-into-chaos/2019/11/12/ff91d332-05a9-11ea-9118-25d6bd37dfb1_story.html

## II. The Offense Conduct

### A. Background

In response to this pervasive cocaine production and trafficking, the Bilateral Investigations Unit of the DEA's Special Operations Division began to target Bolivian drug traffickers in approximately 2017.

By 2018, the DEA—and in particular two confidential sources ("CS-1," and "CS-2," together the "CSes")—had established contact with the defendant and his co-conspirators, and the parties agreed that the defendant would make an initial investment for a multi-kilogram sample of cocaine to be delivered to the United States, with the ultimate goal of facilitating future cocaine shipments of over 1,000 kilograms using the defendant's contacts in the Bolivian airspace control agencies.

### B. The CSes Meet with the Defendant's Co-Conspirators

Starting in May 2017, the DEA recorded meetings between the CSes and a Bolivian cocaine facilitator named Percy Vasquez-Drew ("Vasquez-Drew"). PSR ¶ 14. Vasquez-Drew told the CSes that he could provide thousands of kilograms of Bolivian cocaine and assist them in transporting that cocaine to the United States, via either military or commercial aircraft. The CSes requested a five-kilogram sample of cocaine (the "Five Kilogram Sample") from Vasquez-Drew, which the CSes indicated would be provided to customers in New York City. *Id.*

In April 2018, the CSes met in Bolivia with Vasquez-Drew, who introduced Osvaldo Londono-Vanegas ("Londono") as his cocaine supplier. *See id.* The CSes met again with Vasquez-Drew and Londono in Bolivia on several occasions in April 2018. *Id.* at ¶ 15. During one of the April 2018 meetings in Bolivia, Vasquez-Drew introduced the CSes to Victor Rojas-Bascope and his brother, Ruben Rojas-Bascope, who agreed to launder the money for future cocaine transaction from the United States to Bolivia. *Id.* During these April 2018 meetings, the parties discussed the logistics for a test cocaine sample and future larger shipments—loads as large as 1,500 to 1,700 kilograms—and they agreed that a five-kilogram sample would be sent to Miami via a commercial aircraft. Thereafter, the CSes paid Vasquez-Drew and Londono $15,000 for the sample, and at a subsequent meeting in April 2018, Vasquez-Drew and Londono showed the CSes the bricks of cocaine. Vasquez-Drew and Londono also advised the CSes that the transport of the cocaine to Miami would cost $30,000 (a rate of $6,000 per kilogram), which included the costs of bribing Bolivian airport officials to facilitate the shipment. *See id.*

On May 10, 2018, Victor Rojas-Bascope met CS-1 in Manhattan, where CS-1 gave Rojas-Bascope $30,000 in cash. *Id.* at ¶ 16. Rojas-Bascope then conducted a FaceTime call with Londono to confirm the transaction. *Id.* Despite the $30,000 payment, however, the Five Kilogram Sample did not arrive in the United States. *Id.* One of Londono's associates told the CSes, in sum and substance, that the Five Kilogram Sample had been stolen.

### C. The CSes Meet with the Defendant

In an attempt to make up for the lost Five Kilogram Sample, Londono introduced the CSes to other narcotics traffickers who could facilitate shipments of cocaine from Bolivia to the United States. On July 28, 2018, Londono introduced the CSes to the defendant. *Id*. at ¶ 17. During the meeting, which took place in Bolivia and was recorded by the CSes, the defendant described his prior involvement in drug trafficking and the contacts he had in the Bolivian government and other agencies who could help drug traffickers export multi-ton quantities of cocaine from Bolivia. *Id*. The CSes told the defendant, in sum and substance, that if a sample of cocaine was acceptable to their intended buyers in New York City, that the parties—including the defendant—could plan on future shipments in excess of over 1,000 kilograms of cocaine into New York City from Bolivia. *Id*.

The defendant, who had contacts at Bolivian airspace control agencies, told the CSes that an initial test sample could be sent via commercial flight, but that larger shipments would require greater logistical support, which he could help facilitate. *See id*. at ¶¶ 17-18. Indeed, while discussing air freight methods, the defendant explained to the CSes that a plane intended to be used for a ton-quantity cocaine shipment could land at a clandestine airstrip in Bolivia to be loaded with the cocaine, but that—because of its size—any such plane would need to land at an established airport for refueling. *Id*. at ¶ 18. For that, the defendant explained, in sum and substance, that air traffic controllers would need to be bribed to cover up the plane's unscheduled landing at a clandestine airstrip. *Id*. The defendant further explained, in sum and substance, that bribing law enforcement officials in particular regions for the safe passage of the airplane would be required; for example, the defendant explained that he was aware that other traffickers had bribed law enforcement officials in the Cochabamba region of Bolivia to allow large-scale cocaine flights. *Id*. The defendant also suggested using his almond-export business as a cover for significant cocaine exports. *Id*.

During this same meeting, the defendant told the CSes that his own familial connections to individuals highly placed in Bolivia's relevant airspace control agencies, and directly to air traffic controllers at certain international airports, could be exploited to secure the requisite logistics for larger-scale cocaine flights. *Id*. at ¶ 19. At one point during the meeting, after learning from the CSes that they intended to load 1,700 kilograms of cocaine onto a flight, the defendant even placed a phone call in front of the other meeting participants to a family member he explained had access to Bolivian government airspace officials and could assist their venture. *Id*. On that call, the defendant instructed his family member to reach out to the individual in charge of Bolivia's Administration of Airports and Auxiliary Services to Air Navigation ("AASANA"), because the defendant was currently meeting with "some people" who would need "the guy's services."

The defendant further indicated to the CSes that he was interested in expanding further cocaine business in the New York City-market, and was willing to invest in the test load to further the enterprise. PSR ¶ 19. Specifically, the defendant told the CSes, in sum and substance, that he had a contact in New York that was interested in receiving a cocaine shipment. After the meeting, the defendant provided $5,000 to Londono, who then used the $5,000 to help secure the test shipment of cocaine to the United States. *Id*.

### D. The Cocaine Sample and the Defendant's Arrest

Ultimately, with the defendant's investment, Londono, Vasquez-Drew, and others orchestrated the production of approximately ten kilograms of cocaine and its transport to Miami via commercial aircraft. *Id*. The cocaine, which had been concealed in luggage and is pictured below, was seized by law enforcement when it arrived in Miami in September 2018. *Id*.



In March 2019, Vasquez-Drew and Londono were arrested in Panama, after they traveled there for a purported meeting with the CSes to discuss the shipment of over 1,500 kilograms of cocaine to the United States. *See* PSR ¶ 20. The defendant, who had been invited to the meeting as well but did not attend, was not arrested until May 5, 2021, when he arrived in Miami on a commercial flight. *Id*. at ¶ 22.

## III. Procedural History

On February 12, 2019, the defendant was charged in Indictment S5 19 Cr. 91 (DLC) (the "Indictment") in the Southern District of New York. The Indictment charged the defendant with (i) conspiring to import five kilograms and more of cocaine into the United States, in violation of Title 21, United States Code, Section 963 ("Count One"); and (ii) importing cocaine into the United States, in violation of Title 21, United States Code, Sections 812, 959(a), 959(d), 960(a)(3), and 960(b)(1)(B)(ii), and Title 18, United States Code, Section 2 ("Count Two").

On February 17, 2022, the defendant pled guilty to Counts One and Two of the Indictment pursuant to a plea agreement (the "Plea Agreement"). In the Plea Agreement, the defendant stipulated that the offense conduct involved more than 450 kilograms of cocaine—the highest level available under the Guidelines—and as such, the base offense level is 38. Based on

information currently available to the Government, because the defendant appears to meet the criteria for Safety Valve eligibility, a two-level decrease to the base offense level is warranted. And because of the defendant's timely acceptance of responsibility, an additional three-level decrease is warranted. The defendant's offense level under the Plea Agreement is thus 33. Given the defendant's lack of any known criminal convictions, the defendant is in Criminal History Category I. Accordingly, the Plea Agreement included a Guidelines range of 135 to 168 months' imprisonment (the "Stipulated Guidelines Range").

Consistent with the Plea Agreement, the Probation Office calculates a total offense level of 33, Criminal History Category of I, and Guidelines range of 135 to 168 months' imprisonment. PSR ¶¶ 30-44, 71.

## DISCUSSION

**I.      A Guidelines Sentence is Appropriate in this Case**

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. In particular, the seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law, and the importance of achieving deterrence all support the imposition of a Guidelines sentence in this case.

The nature and circumstances of the defendant's offense merit a serious sentence. *See* 18 U.S.C. § 3553(a)(1). The defendant conspired to import over 1,700 kilograms of cocaine into this country, an amount well beyond the five-kilogram quantity of cocaine that ordinarily suffices to trigger a 10-year mandatory minimum sentence. In addition to the ten-kilogram sample of cocaine that was seized in Miami, the defendant and his co-conspirators had plans to import multi-ton quantities of cocaine from Bolivia into the United States—enough to flood this community for years and place him comfortably, and undisputedly, within the highest bracket of the Guidelines Drug Quantity Table. Few drug-trafficking cases involve such large amounts of cocaine intended to be imported into the United States. In fiscal year 2020, fewer than 8% of the 15,877 cases involving the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38.[9] As courts in this District have recognized, "the harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, 16 Cr. 453 (RJS), Dkt. No. 160, at 27; *see also United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) ("[T]he drugs at issue here cripple individuals and destroy families and whole communities."). Indeed, as the Court recognized at Vasquez-Drew's sentencing, "there's no dispute here that this a very serious crime and with serious consequences and it deserves a significant sentence." *United States v. Vasquez-Drew*, 19 Cr. 91 (DLC) (Sept. 10, 2020), Sentencing Tr. at 29.

---

[9] *See* Use of Guidelines and Specific Offense Characteristics, Guidelines Calculation Based, Fiscal Year 2020, at 27, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf (last visited on June 5, 2022).

Beyond the anticipated drug quantity, which itself is staggering, the defendant's willingness to use governmental and quasi-governmental contacts in Bolivia to facilitate future cocaine shipments is particularly troubling and further supports a Guidelines sentence. As described above, not only did the defendant provide an initial investment to facilitate a multi-kilogram sample of cocaine that actually reached the United States, but he also told the CSes that, through his Bolivian contacts, flights intended for large-scale cocaine trafficking could arrive in and leave from Bolivia without issue. In addition to the defendant's statements to the CSes about (i) his prior involvement in cocaine trafficking, (ii) his access to individuals within Bolivia's airspace control agencies, and (iii) his knowledge of flight paths for cocaine shipments out of Bolivia, the defendant's willingness to rely on corrupt Bolivian officials was demonstrated when he placed a phone call to a family member instructing her to reach out to the head of AASANA because the defendant and his co-conspirators would need that individual's "services" in the future. The gravity of this aspect of the defendant's conduct is illustrated by considering the level of sophistication, experience, and access that would be required for someone to rely on high-level officials to facilitate cocaine shipments in and out of airports. There is simply no way to minimize the seriousness of that conduct.

The history and characteristics of the defendant and the need to promote respect for the law also call for a substantial sentence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The defendant had ample opportunity to lead a law-abiding life. As reflected in the PSR, the defendant benefitted from a "happy childhood, during which time he enjoyed close relationships with his parents, brother, and extended family members." PSR ¶ 48. He went to college to study architecture and completed enough coursework to obtain employment as a surveyor, and also completed various courses pertaining to auto-mechanics, home electricity, and liquid porcelain technology. *Id*. at ¶ 59, 60. Prior to his arrest, the defendant also worked as a cattle rancher and operated various businesses. *Id*. at ¶ 63. But instead of relying on those lawful ways to make a living, the defendant chose a different, illicit course and decided to partake in a conspiracy to import multi-ton quantities of cocaine into the United States. The defendant even offered to use his legitimate almond-export business as a cover for cocaine shipments. And while the defendant may not have any prior convictions, he told the CSes that he had prior drug trafficking experience, including cocaine purchasers in the United States, and that his contacts within Bolivia could facilitate future cocaine shipments. The defendant also made clear that he had every intention to leverage those contacts so that he could participate in large-scale drug trafficking with Londono and the CSes. That intent was further confirmed when the defendant provided Londono with $5,000 to facilitate a sample shipment of cocaine to the United States. Absent the involvement of individuals like the defendant—connectors who can leverage their access and experience, and also investors who can help fund the importation of cocaine—the flow of cocaine from South America would be much diminished. Indeed, such massive cocaine distribution schemes require networked individuals to corral corrupt government officials, suppliers, and transporters. In being all too eager to play this role, the defendant manifested a deep disrespect for the law and thus deserves a Guidelines sentence.

Moreover, the need to afford adequate deterrence to the defendant and others similarly situated, and to protect the public from other crimes of the defendant, also speaks loudly to the need for a serious sentence in this case. *See* 18 U.S.C. §§ 3553(a)(2)(B)-(C). The defendant's intended drug-trafficking activities involving governmental and quasi-governmental connections

is not an aberration but, rather, endemic of one of the most serious issues facing American efforts against cocaine trafficking over the last several decades. Indeed, the most well-worn cocaine trafficking routes to this community often rely upon public officials abusing their positions to enable the flow of illicit narcotics.[10] The sentence imposed should therefore demonstrate that cocaine trafficking will not be tolerated, and that traffickers, like the defendant, who seek to import significant amounts of cocaine and rely on corrupt officials along the way, will face significant consequences when they are caught. And with respect to specific deterrence, the defendant is seeking to return to the country from which he previously attempted to use his contacts to facilitate large-scale cocaine shipments and, given the DEA's expulsion from Bolivia, could just as easily return to engaging in the type of criminal conduct that resulted in the instant case. As such, the need to deter the defendant and others who would consider the same path should carry a heavy weight in determining the defendant's sentence.

Finally, a sentence within the Stipulated Guidelines Range would be in line with the sentences this Court has imposed for other defendants in this case, as explained further below.

## II. The Defendant's Sentencing Arguments are Unpersuasive

The defendant's sentencing submission argues for a sentence of 30 months' imprisonment, an almost nine-year downward variance from the bottom of the Stipulated Guidelines range. The defendant's request rests on three primary arguments. First, the defendant argues that he is far less culpable than co-defendants who have already been sentenced by the Court. Second, the defendant argues that he has faced unduly harsh conditions while incarcerated during the COVID-19 pandemic. And third, the defendant argues that his extraordinary family support merits a sentence significantly below the Stimulated Guidelines Range. Each of these arguments fails.

First, with respect to the defendant's relative culpability among co-defendants, the Government does not view the defendant as so differently situated from Vasquez-Drew (sentenced to 120 months' imprisonment) or Victor Rojas-Bascope (sentenced to 150 months' imprisonment) such that a downward variance from the Stipulated Guidelines Range is warranted, much less a sentence so significantly below the Stipulated Guidelines Range as that requested by the defendant. *See* Def. Mem. at 8-10. The Government views the seriousness of the defendant's conduct as similar to that of both of those co-defendants. While the defendant may have been involved in fewer meetings with the CSes than Vasquez-Drew and Rojas-Bascope, he nevertheless played a critical role in the conspiracy by offering to use his contacts in Bolivia to ensure that flights intended for large-scale cocaine trafficking could enter and leave the country without issue. Much like the recorded meetings that the CSes had with Vasquez-Drew and Rojas-Bascope, the almost two-hour recorded meeting between the CSes and the defendant involved discussions of large-scale cocaine trafficking out of Bolivia and the pricing

---

[10] *See, e.g.*, State Department: 2019 International Narcotics Control Strategy Report, *available at* state.gov/wp-content/uploads/2019/04/2018-INCSR-Vol.-I.pdf. ("Public corruption, including among senior government officials, is a major problem in Venezuela, making it easier for drug-trafficking organizations to smuggle illegal drugs.").

and logistics of transporting the cocaine from Bolivia to the United States, further underscoring the knowledge the defendant had about the intended scale of their operation. Like Vasquez-Drew, the defendant has no known criminal convictions, but the defendant nonetheless demonstrated his experience in drug trafficking and his access to corrupt officials by promising to leverage his contacts in Bolivia to ensure that the plan to import cocaine to the United States would succeed. Moreover, unlike Vasquez-Drew and Rojas-Bascope, both of whom *received* money from the CSes to facilitate the shipment of a cocaine sample, the defendant himself actually invested $5,000 to ensure that a multi-kilogram shipment of cocaine—which was intended as a sample for future large-scale shipments—reached the United States, further underscoring the defendant's intent to be a key player in this conspiracy. Thus, while the defendant may not have handled as much money as Vasquez-Drew or Rojas-Bascope, or participated in as many meetings, he still played a critical role in a conspiracy to import massive amounts of cocaine to the United States. A sentence within the Stipulated Guidelines Range would thus adequately capture that conduct and would be consistent with the sentences imposed on other similarly situated defendants.

Second, the defendant argues that the conditions of confinement at the MDC during the COVID-19 pandemic weigh in favor of a sentence significantly below the Stipulated Guidelines Range. *See* Def. Mem. at 10-11. While the Government certainly recognizes that the COVID-19 pandemic made incarceration during this time more difficult, the lockdowns at federal prisons were the result of reasonable and temporary steps that the Bureau of Prisons has taken to protect inmates such as the defendant, and they are similar to actions the entire country has taken in order to slow the spread of the virus. Thus, while the Court can properly consider the impact of the pandemic on conditions of confinement in determining the appropriate sentence, the Government respectfully submits that, in light of the seriousness of the defendant's crimes and the other factors described above, a sentence within the Stipulated Guidelines Range remains appropriate.

Finally, the defendant argues that the support of his family, and the impact that a significant sentence will have on his family, weigh in favor of a sentence of 30 months' imprisonment. *See* Def. Mem. at 11-12. To be sure, the Government recognizes that the defendant has the love and support of his family, and that a sentence within the Stipulated Guidelines Range will undoubtedly impact not only the defendant, but also his family in Bolivia. But that is sadly the case for nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). Furthermore, these unfortunate consequences of criminal conduct were entirely foreseeable to the defendant; no one else but the defendant made the choices that resulted in him being separated from his family. *See United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). Accordingly, these concerns should not carry significant weight in determining the defendant's sentence.

### III. The Court Should Impose a Guidelines Fine

The Court should also impose a fine within the stipulated Guidelines range of $35,000 and $10 million. *See* PSR ¶ 81. The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

The defendant has not met his burden of establishing that he is unable to pay a fine, nor can he. The defendant has assets in Bolivia worth over $100,000, and reported that, prior to his arrest, the net profits from the purchase and sale of livestock on his cattle ranch were approximately $60,000 every four months, and that he also made approximately $30,000 annually from selling chestnuts harvested on the ranch. PSR ¶¶ 61, 65. Accordingly, in light of the defendant's failure to meet his burden on this issue, the balance of the Section 3553(a) considerations described herein warrant the imposition of a fine within the Guidelines range that will serve as not only appropriate additional punishment, but also as a critical component of the general deterrence message resulting from the upcoming sentencing.

### **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should impose a term of incarceration within the Guidelines range of 135 to 168 months' imprisonment and a fine within the Guidelines range of $35,000 to $10 million.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Sam Adelsberg
Matthew Hellman
David Robles
Assistant United States Attorneys
(212) 637-2494 / 2278 / 2550

cc: Defense Counsel (by ECF)