M6ABANES

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          19 Cr. 91 (DLC)

5  CARLOS ROBLEDO-ANEZ,

6

7            Defendant.

8                                        Sentence
   ------------------------------x
9
                                         New York, N.Y.
10                                       June 10, 2022
                                         2:00 p.m.
11

12  Before:

13
                        HON. DENISE COTE,
14
                                         District Judge
15
                         APPEARANCES
16
   DAMIAN WILLIAMS
17      United States Attorney for the
        Southern District of New York
18  BY:  DAVID J. ROBLES
        Assistant United States Attorney
19
   ROBERT OSUNA
20      Attorney for Defendant

21

22  Also Present: Rossana Testino-Burke, Interpreter (Spanish)

23            Humberto Garcia, Interpreter (Spanish)

24

25

M6ABANES

1          (Case called)

2          MR. ROBLES:  Good afternoon, your Honor.  David Robles

3  for the government.

4          THE DEPUTY CLERK:  For the defendant.

5          MR. OSUNA:  Robert Osuna.  Yes, your Honor.  We're

6  ready to proceed.  Good afternoon.

7          THE COURT:  Good afternoon, everyone.  We are assisted

8  today by an interpreter who is certified to interpret between

9  Spanish and English.  Mr. Robledo, if you have any difficulty

10  understanding what is being said through the interpreter, will

11  you please let me know immediately.

12          THE DEFENDANT:  Yes, your Honor.  Thank you.

13          THE COURT:  Good.  I want to advise counsel that under

14  our Covid protocol if you wish to address me without a mask,

15  you may do so by using the podium.  Thank you.  Up to you

16  entirely how you want to proceed.

17          Mr. Osuna, was the presentence report translated to

18  your client?

19          MR. OSUNA:  Yes, your Honor.  I met with my client.

20  We reviewed it in Spanish. I'm bilingual and he had no problem

21  understanding.

22          THE COURT:  Did you discuss it with each other after

23  you read it to him?

24          MR. OSUNA:  Yes, we did discuss it.

25          THE COURT:  Do you have any objections to the report

M6ABANES

1    other than what might be contained in your written sentencing

2    submission?

3         MR. OSUNA:  No, your Honor.  No other objections.

4         THE COURT:  Thank you.  The presentence report will be

5    made part of the record in this case and placed under seal.  If

6    an appeal is taken, counsel on appeal may have access to the

7    sealed report without further applications to this Court.  I

8    have defense submission filed on June 2, and it contains a

9    number of attachments, all of which I've reviewed, and I have a

10   June 7th letter from the government.

11        This is a case in which the defendant entered a plea

12   of guilty to two counts pursuant to a plea agreement with the

13   government that included an offense level of 33 and a criminal

14   history category of I.  The PSR makes the same calculation.

15   I've reviewed it and adopt it as my own.  The guidelines range

16   is therefore 135 to 168 months in prison.  The government

17   recommends a sentence within the guidelines range.  Probation

18   department recommends a sentence of 120 months.  The defendant

19   requests a sentence of 30 months.  Among other issues, the

20   defendant stresses that his term of incarceration has been

21   served so far under difficult conditions because of the

22   pandemic.

23        He points as well to two other sentences that I've

24   imposed for co-defendants, or co-conspirators.  One was a

25   sentence of 120 months, another was a sentence of 150 months,

M6ABANES

1    and he points as well to the strong support the defendant has

2    from his family.  The defendant was engaged in a significant

3    way with respect to a scheme to import cocaine into this

4    country from Bolivia, including with a test shipment financed

5    by the defendant.  The defendant in his conversations with

6    informants indicated a familiarity with this kind of scheme and

7    contacts in law enforcement and in the aviation community that

8    would that assist in the successful delivery of substantial

9    amounts of cocaine into this country.  I will hear from you,

10   Mr. Robles.

11        MR. ROBLES:  Thank you, your Honor.  Just very

12   briefly, the government's position is set forth fully in our

13   submission, but I did want to highlight for the Court certain

14   factors that the government views as particularly compelling in

15   which the government respectfully submits should guide the

16   Court's sentence, the sentence that the Court would impose in

17   this case.

18        And I want to note at the outset that the government

19   is certainly mindful that we're advocating for a sentence that

20   is high.  The guideline range is significant here, but we've

21   given it careful consideration and we do believe that a

22   sentence within the guidelines range would accurately capture

23   the seriousness of the offense and the other 3553(a) factors

24   that the Court must consider when imposing sentencing.

25        First, as the Court noted, this is a serious offense.

M6ABANES

The defendant played an integral part in a conspiracy to import

massive amounts of cocaine to the United States. He put down an

initial investment to ensure that a sample load of cocaine

reached the United States, a sample load which did in fact

reach the United States which was intended to be essentially a

test sample for much larger transactions if they were to come

to fruition.

And what the government found particularly striking

here with respect to the defendant's conduct was his

willingness to leverage contacts that he believed he had within

Bolivia in the aerospace industry as the Court noted, and in

other areas of Bolivia to facilitate much larger transactions.

In fact, as we noted in our sentencing submission,

immediately after the defendant was told that one of the

shipments was going to be for around 1700 kilos of cocaine, the

defendant immediately placed a phone call to a family member

instructing that person to inform the individual in charge of

one of the aerospace agencies in Bolivia to essentially tell

that person that they were going to require his services in the

future, which from the government's perspective obviously shows

the defendant's willingness to leverage those contacts and his

intent to further this conspiracy.

We'll note that with respect to the defendant's

history and characteristics. He has no known prior criminal

convictions.  As we said in our submission, the defendant does

M6ABANES

1    appear to be safety valve eligible in this case.  I'll note for

2    the Court and respectfully ask that this particular portion of

3    the transcript be maintained under seal.

4              THE COURT:  Excuse me.  There's no need to address on

5    the public record anything that should be sealed.

6              MR. ROBLES:  Understood, your Honor.  The defendant

7    from the government's perspective meets the criteria for safety

8    valve eligibility.  But, again, despite having any known

9    criminal convictions, the defendant here made clear to the

10   confidential sources on recordings that he had contacts he was

11   willing to leverage for drug trafficking that he was willing to

12   actually go forward with those transactions.

13             And the fact that the defendant is someone who seems

14   to have grown up in a close-knit family, had education, had

15   lawful employment, I think really here is troubling because it

16   shows that the defendant had every incentive to continue

17   leading a law-abiding life, but instead chose to engage in this

18   conspiracy to import cocaine into the United States.

19             And finally, just with respect to deterrence.  The

20   government knows that the defendant after completing any

21   sentence will be sent back to Bolivia where the defendant

22   himself acknowledged he has contacts that could help facilitate

23   large scale cocaine shipments, so the government has some

24   concern from a specific deterrence perspective with that.

25             And finally just as a matter of general deterrence the

M6ABANES

1    government respectfully submits, that a sentence here within

2    the guidelines range would show that those individuals seeking

3    to import large amounts of cocaine to the United States to

4    leverage government contacts in order to facilitate those types

5    of deals, that a guideline sentence here would show that those

6    crimes will be punished with heavy sentences.

7            And so unless the Court has any further questions, the

8    government will rest on its submission.

9            THE COURT:  Mr. Osuna.

10           MR. OSUNA:  Yes, your Honor.  Thank you very much.

11   Firstly, I would like to thank the government that they've been

12   very kind and decent with my client since the inception of this

13   case.  I would further thank my client's family that flew in

14   all the way from Bolivia to be here present today.  I've noted

15   very often in this courthouse I've seen defendants who live in

16   the Bronx and their families won't come down here to support

17   them.  These individuals came all the way from Bolivia to beg

18   for their husband and father's life.

19           Your Honor, I have to begin with the conduct.  To

20   disregard the conduct or to understate the seriousness of the

21   conduct I think would be foolish on my part. To American ears

22   it sounds an outrage.  There's a country in Latin America that

23   people presume is an ally that is really not an ally, that

24   there are people that are not participating with our Drug

25   Enforcement Agency, not cooperating with our international

1  authorities and thinking that they could take advantage of it,

2  so I understand the government's need to have a deterrent

3  effect.  I can understand the government's need to punish this

4  conduct.  I frankly wasn't aware that this kind of conduct was

5  even going on in Bolivia, but I'm not Bolivian, so I understand

6  the need to punish and to punish severely that conduct.  I

7  understand that.

8         However, I ask the Court to look at my client's

9  conduct and his entire life, the conduct that this one meeting

10  in the scope of his entire life.  My client is now 56 years

11  old.  At the time that this had happened, he had grown up with

12  his family on a farm well outside the city.  At this time, they

13  had moved to the city, Santa Cruz, which is the capital city,

14  and it was there that my client's wife opened a little

15  restaurant and he had a little real estate office and they were

16  brokering cars.  That's when he got introduced to these types

17  of people and he made that investment.

18         Of course he shouldn't be making any investments with

19  any drug dealers, of course not.  If I was allowed to throttle

20  a client, I would have throttled this man, because it's such a

21  marked departure from the life that he apparently led.  But to

22  his credit, he withdrew from that conspiracy.  He did not --

23  all the talk about airports and everything that he discussed

24  there, he did not provide any of that support thereafter.  He

25  withdrew.  That shipment was lost. He never appeared again on

M6ABANES

1   the government's radar.  He didn't follow-up with that

2   investment.  He didn't follow-up, hey, what happened.

3         I know what happens through experience with drug

4   dealers.  They lose a shipment, they start fighting.  Hey, I

5   got robbed, who took that shipment.  There better be proof.

6   What's going on.  He did none of that.  He withdraw.  He got

7   out of the city because he realized that -- when they met in

8   Panama, he was invited to Panama where they were all arrested.

9   And he said, I'm not going.  I come from a farm.  I have no

10  business being in Panama with these people.

11        He realize that those people, the co-defendants,

12  Mr. Vasquez-Drew and Mr. Londono, who were there in Panama.  He

13  said these people are far more sophisticated than myself, and

14  he withdrew.  He and his family, he closed his office that he

15  had there. He closed his wife's restaurant, and they went right

16  back.  They abandoned everything they had there, disconnected

17  his phone and went right back to his family farm where his

18  family has been probably for generations.

19        THE COURT:  So what prompted that withdrawal?  Was it

20  the seizure of the drugs or arrests?

21        MR. OSUNA:  No, I think it was just flatout fear that

22  he didn't want to participate.  The meeting in Panama, he was

23  invited to that meeting.  He did not go to that meeting.  He

24  didn't know they were going to be arrested in Panama.  Nobody

25  knew, obviously, that's why they got arrested there, but he

M6ABANES

1    specifically did not go because that meeting in Panama, he

2    realized was something he never participated in before.  It was

3    something outside of his experience, so he did not go.  Nobody

4    knew they would be arrested in Panama.  By the time that arrest

5    came in Panama, he was already back on his family farm, so he

6    wasn't arrested there.  That was in 2019 those individuals were

7    arrested.  He's arrested later on coming into the United States

8    for a family trip.

9            THE COURT:  Yes, I understand that, but the

10   description I have of the recording indicates a far more

11   sophisticated knowledge, understanding and participation than

12   what you are describing to me.

13           MR. OSUNA:  Well, the conversation is extensive. The

14   conversation does display a knowledge of what was going on

15   because he already met with Mr. Londono, the co-defendant.  He

16   already met with him before.  He knew him, that's why he had

17   come to my client seeking that investment, so he knew what was

18   going on.  It's a small country.  Everybody there knows what's

19   going on, but he did not provide that logistical support.  If

20   you see, the other co-defendant, Mr. Vasquez-Drew, he did have

21   contacts and airplanes.  He sent his pregnant wife to the

22   United States with pieces of a plane. That's an individual

23   who's providing extensive support.  He discussed all those

24   things, but he did not provide the support.

25           THE COURT:  Well, he financed.  He participated in the

1    financing of the transaction.

2            MR. OSUNA:  Yes, absolutely, for that he pled guilty.

3    Absolutely, of course.  I don't deny that financing of that

4    shipment.  To his credit, he did not follow through on that

5    shipment.  He did not try to send any other shipments.  He did

6    not provide any additional support.  Other than that one

7    meeting and that one financing, he doesn't appear on the

8    government's radar.  He was not extradited from his country.

9    He came here voluntarily on a family trip.  So he did not

10   provide that additional logistical support that the other

11   co-defendants were in fact providing, were in fact engaged in,

12   that meeting in Panama, as per the government's submission, was

13   discussions of an additional 1500 kilos.  Mr. Vasquez-Drew had

14   discussed 60 kilos and bricks and kitchens and laboratories of

15   his own.

16           My client had that one -- albeit clearly guilty,

17   meeting.  He financed a drug transaction.  That's clearly

18   illegal.  It should clearly be punished.  It should be punished

19   accordingly.  Other than that one day in his entire 56 years,

20   that's the extent of his criminal participation in this case,

21   so I would ask the Court in sentencing my client to take that

22   participation in light of the much wider conspiracy that was

23   going on here.

24           The second individual who was sentenced to, I believe,

25   was 150 months, that gentlemen had an indictment in Miami.  He

M6ABANES

1    had an indictment here. He was laundering money with his

2    brother.  According to the government's submission in that

3    case, they tried to take over the whole route, the whole

4    operation, so I understand those individuals' participation was

5    far greater than my client's.

6         I'm not minimizing my client's conduct, Judge.  I

7    don't want to impress that upon the Court.  I am severely

8    stating, I understand the need to punish his conduct.  That is

9    a gross violation of our laws.  Thinking that you can ship

10   drugs here with impunity has to be punished.  I get that.  I

11   fully understand it.  I'm simply stating in light of the wider

12   conspiracy that was going on here, his participation was not as

13   great as that of the others and he withdrew, did not go to

14   Panama.  He had no idea they were going to be arrested.  He

15   didn't go there because he didn't want to participate in what

16   those individuals were doing at that time.

17        Again, your Honor, as the government touched upon, my

18   client has led what I would say a very charmed life.  Coming

19   from a Latin American country, his family has owned that farm

20   where he is from for generations.  He's been married to the

21   same woman for well over 30 years.  They've raised three

22   wonderful children.  He had a good education.  My client was

23   well-respected in his community of cattle ranchers.  He's cared

24   for his elderly parents.  His father died while he was here.

25   His father found out about his arrest.  It was his stepfather,

M6ABANES

1    but he raised him from childhood.  The gentleman passed away

2    while he was incarcerated here.  My client at 56 is at that

3    weird age in his life where you're taking care of your parents

4    because they're elderly and infirmed or like children, and

5    you're still taking care of your young kids because they

6    haven't fully grown up yet.

7           He has been the rock and the center of this family.

8    To his credit, he's always been a good husband, a good father.

9    It's been hard breaking.  When I met my client's wife and she

10    came to New York, she said to me, Mr. Osuna, I was shocked

11    about this.  I was shocked.  She was like, I'm in the

12    restaurant next door.  I had no idea this was going on in my

13    husband's office.  And I told her I said, you know, this is

14    nothing that your husband was proud of.  This is nothing that

15    he would share with you.  It was likely his fear for his family

16    that forced him to abandon the city and to go back to where

17    they were from to their little town where he lives in the

18    mountains there.

19           Your Honor, again, I state, many people, like the two

20    individuals who were arrested here.  They come to court and

21    they find God here. They come to court with a bible.  They come

22    to court after they've been arrested with their hand in the

23    jar.  That didn't happen.  Years went by between the criminal

24    conduct here and his arrest.  He did not participate any

25    further after that date.

M6ABANES

1    Again, I will state as to his extraordinary family

2    support.  Again, I credit these individuals for flying here.

3    This is very difficult, very expensive when people from the

4    mountain side of Bolivia to come here to the United States to

5    show support for their family members.  These are hardworking

6    people.  My client had been a hardworking person.  This has

7    been a terrible embarrassment for himself, for his community,

8    for the people who know him in the community.

9    His children have suffered.  Prior to this arrest, his

10   kids were all known because the families that know each other.

11   They know the grandparents.  Everybody there knows each other.

12   And prior to that, they were all looked as kids who came from a

13   nice family.  And now you know what they're looked at, they're

14   looked at like the kids of a drug dealer, the kids of someone

15   whose father's in prison in the United States having done

16   something stupid and something illegal, and my client feels

17   that pain everyday.  He feels that pain, your Honor.

18   So, your Honor, in imposing the sentence, I understand

19   the guidelines here.  I get it.  I'm asking for a marked

20   departure from the guidelines.  I don't do that easily.  I

21   don't.  I understand the guidelines.  As I told you to American

22   ears, reading this, when I first saw this, I got mad and hurt.

23   I got mad, so I understand that I'm asking for a serious

24   departure from the guidelines here.  I understand that, but I

25   do so in looking at this gentleman's entire life.  I look at

M6ABANES

1    his age.  I look at his health.  He's not going to die soon,

2    but he did contract Covid inside MDC which is really

3    frightening, really scary being locked down.  It's very

4    frightening being away from your family not knowing if you will

5    survive a severe pandemic disease, not knowing if you ever see

6    your kids again, not knowing if you see your wife again.

7         These poor folks when they flew here, they came, and

8    because the jail was shut down, they sent me a picture of them

9    across the street from the MDC in Brooklyn crying, and it broke

10   my heart.  I told them, I said, the jail is closed.  It's

11   Covid. I'm very sorry.  The BOP is doing what they can do.

12   They're doing their very best in there, and I know because I go

13   in. I said, but it's closed to visitors to go and see him.

14        I understand that there's a greater stressor when an

15   individual is close to their family.  You know we always ask at

16   the end of sentencing, please put them in Fort Dix. Please put

17   them in Pennsylvania so their family can visit.  There's

18   nowhere you could put my family where his family can easily

19   visit which is a greater stressor upon someone.

20        I ask the Court to consider that he did have a long

21   life with a good education.  This was a marked departure from

22   the life that this gentleman had led.  Of course he has to be

23   punished.  The message has to be sent.  I agree with the

24   government.  People in Bolivia have to know that you don't do

25   this, that this is not free willing Franklin that you just send

1  drugs here and who cares, so I understand that that sentence

2  has to be imposed, Judge.  I understand that.

3      But I ask the Court in imposing that sentence to look

4  at the entirety of this gentleman's life, to look at the 3553

5  factors that have to prevent, right, to protect the society

6  from further crimes of the defendant.  Statistics show that

7  recidivism is very rare as you age.  This gentleman is 56 now.

8  The likelihood that he is going to serve a sentence here and

9  might be sentenced here and go home and God forbid get back

10  into criminal conduct is very, very small.  He hadn't had any

11  criminal conduct in the two years since the incident and his

12  arrest.

13      So I credit him when he says to me, Mr. Osuna, this is

14  my last.  I made this mistake.  I want to pay my debt to

15  society.  I want to go back to my family.  I want to see my

16  mother before she dies. I want to spend time with my kids as

17  they grow.  I want to spend time with my wife.  I fully credit

18  this individual.  Lord knows I've had clients here in this

19  courthouse and others with an arrest record longer than my arm.

20  And they say to me, Robert, I'll never do it again, and I'm

21  looking at them with my eyes crossed-sided, because I can't

22  credit them because they have such a long history.

23      As opposed to when I have a gentleman like this, who's

24  been to school, who's been educated, who has a future, who has

25  a means of supporting himself and his family.  I credit that

M6ABANES

contention.  Judge, again, I thank you, and I would ask you to

impose the sentence I've requested for in my submission.  Thank

you very much.

         THE COURT:  Thank you.  Before I hear from the

defendant, just on the issue about the defendant voluntarily

withdrawing from criminal activity and not engaging in it

again.  Mr. Robles, did you want to be heard on that issue?

         MR. ROBLES:  Your Honor, I just wanted to note just

the chronology which might be helpful.  So, in July of 2018 is

when the meeting happens that was recorded between the

defendant, Mr. Londono and the confidential sources.  In

September of 2018, so just shortly after that is when the 10

kilograms of cocaine arrived in Miami, test sample that was

intended to be a test sample for much larger transactions.  The

defendant and others were indicted in February of 2019.  That

indictment was under seal.

         And then in March of 2019, there was a meeting in

Panama where Mr. Londono, who was at the initial meeting with

the defendant who was going to be doing these larger deals with

the defendant was arrested, and Mr. Vasquez was arrested there

as well.  And so with respect to his withdrawal from the

conspiracy, the government would respectfully submit that the

timing there is such that the defendant participated in a

meeting in July, a test sample was sent that he helped finance,

and then his co-conspirators were arrested shortly thereafter.

M6ABANES

 1  And so unless the Court has any further questions, I'll leave

 2  it at that.

 3          THE COURT:  So you do not know when this return to the

 4  country and selling the restaurant and getting out of the

 5  business in the city occurred?

 6          MR. ROBLES:  No, your Honor.

 7          THE COURT:  And the 10 kilograms, were they seized in

 8  September?

 9          MR. ROBLES:  They were seized in September when they

10  arrived in Miami.  They were seized by customs and border

11  patrol.

12          THE COURT:  So it is, I take it, the government's view

13  that at that point in September, those involved in that

14  shipment would have understood that there was a risk that the

15  government had been involved in following or infiltrating the

16  organization?

17          MR. ROBLES:  I think that is fair to say, your Honor.

18          THE COURT:  Thank you.

19          MR. ROBLES:  I just wanted to clarify one piece

20  defense counsel said just to clarify.  When the government was

21  making its deterrence argument, it was not discussing -- I

22  think defense counsel said that individuals in Bolivia need to

23  be deterred from this.  The government's point was that

24  individuals involved in drug trafficking at large and

25  individuals relying on government officials at large need to be

M6ABANES

1    sent a message that those actions will be met with serious

2    consequences.

3            THE COURT:  So the government's position that those

4    involved in illegal narcotics transactions wherever they may

5    live need to be deterred?

6            MR. ROBLES:  That's exactly right, your Honor.

7            THE COURT:  Thank you.  So before I hear from the

8    defendant, Mr. Osuna, the government has put a chronology on

9    the record, and I just want to give you a chance to respond if

10   you think any of that's incorrect.

11           MR. OSUNA:  I understand the chronology, of course.  I

12   understand the chronology, and that will stand to reason if a

13   person believed that the government had infiltrated the

14   organization, that would demonstrate the difference between

15   people who have the impunity, like Londono and Vasquez-Drew who

16   don't care and continue operating, and someone who would get

17   the message and say, you know what, the government's involved.

18   I'm done.  I'm not going to continue.

19           Because after the seizure in September, the meeting in

20   Panama takes place later, and those people, everybody knew that

21   that shipment was seized.  And those people said, you know

22   what, I don't care.  I'm going to go on.  I'm going to Panama,

23   going to a beautiful country. We're going to talk about 1500

24   more kilos. Those people act with impunity.  A rationale person

25   says, you know what, if the government was involved, I'm done.

M6ABANES

1  I get it.  This is not my behavior.  This is not behavior I'm

2  going to continue.

3          THE COURT:  Thank you.  Mr. Robledo, I'll hear

4  anything you have to say on your behalf in connection with this

5  sentence.

6          THE DEFENDANT:  I would like to greet you

7  respectfully, your Honor, and also greet everyone present here.

8  And I would like to thank you for allowing me to address you.

9  First of all, I would like to apologize to the United States of

10  America for having participated in that meeting.  This is the

11  first legal problem that I have ever had in my life.  Your

12  Honor, I would like you to know that immediately after that

13  meeting took place, I regretted it, and I also regretted

14  everything that was spoken about.

15          And proof of that is that I didn't follow-up at all.

16  I didn't provide any other information.  I didn't give them any

17  other contacts, phone numbers.  I didn't go to any meetings.  I

18  was invited to a meeting in Panama with all expenses paid for a

19  meeting with purported investors for this endeavor, but I

20  didn't accept that invitation.  I didn't go.  To the contrary,

21  your Honor, I did everything possible to break away from these

22  people.  I closed down my main business in the city.  I closed

23  it down and I lost all my income.  I had to move my wife's

24  restaurant practically losing all of our customers, and we also

25  even had to change addresses and move so that they wouldn't

M6ABANES

1  keep insisting with this issue.  I did all of this having to

2  pay very high fees for having broken our leasing agreements,

3  and I also cut communication with them.  The phone that I was

4  using to communicate with them, I threw it out.

5       Your Honor, it is clear from the investigation and the

6  reports that I didn't know this people before this.  There had

7  been no prior history with them.  And after the meeting, after

8  I decided not to continue with the plans, they started looking

9  for another person.  And everything shows that through that

10  person, they were able to continue with their efforts.  So, I

11  don't know -- I didn't follow-up.  I don't know if they

12  received a sample or if they didn't, if they ended up going to

13  Panama or if they didn't.

14       Your Honor, we came with my wife to the United States.

15  It wasn't because of business.  It was because we were

16  celebrating our anniversary.  It has been 33 years, and we also

17  came to see my sister Acatia who lives here in New York

18       THE INTERPRETER:  Addition.  The defendant also said

19  that his sister Acatia is a U.S. citizen.

20       THE DEFENDANT:  Fortunately, I was detained coming

21  into the United States in Miami.  That was on May 5, 2021, and

22  my wife was left behind alone and desperate at the airport.

23  What was supposed to be a happy occasion has turned into the

24  worst nightmare up until now.

25       Your Honor, I accept my responsibility for having

M6ABANES

taking part in that meeting, and I agree that I must pay with

months of detention because of that mistake.  I promise you

that I will never again get myself involved with shady people

like these and also to respect the laws in my country and also

of the United States.

Your Honor, my family is suffering a great deal

because of this and is experiencing a lot of problems.  I am

the only breadwinner for my family.  We have no money.  I

support my family with my daily work.  Among the problems that

we have experience is that my father passed away while I was in

custody.  When he found out about the news, he died of a heart

attack.  My mother is disabled.  She's in a wheelchair, and

she's not able to walk or talk.  My children were evicted from

the place where there were living at school because of

nonpayment.  My youngest son junior had to abandon his

schoolwork to go back to the farm and help out there.  My

daughter Carlita also had to drop a lot of courses to be able

to help her mother during this time.

Your Honor, I have several medical issues, including

having Covid during the time that I was in custody.  I was very

afraid, afraid about not being able to see my family ever

again.  Your Honor, I implore you as a son who would like to

take care of his mother, as a father who would like to take

care of his children, and as a husband of a woman whom I love.

I plead you to allow me to -- to give me another opportunity.

M6ABANES

1  I would like you to take into consideration my remorse, the

2  remorse that I showed immediately after that meeting.  Your

3  Honor, I felt remorse immediately before being able to cause

4  any harm to society

5          THE INTERPRETER:  Would the interpreter be able to ask

6  the defendant to repeat his last utterance.  Defense counsel

7  seems to think that there is some type of discrepancy?

8          THE COURT:  Yes.

9          THE DEFENDANT:  I would like you to judge me based on

10  the immediate remorse I have felt after the meeting before

11  being able to cause harm to society.

12          THE INTERPRETER:  The interpreter would like to

13  request for repetition.

14          THE DEFENDANT:  Please don't use me as an example of a

15  harsh punishment so that others won't commit these same acts.

16  But, do take into account a person who feels remorse after the

17  fact and chooses not to become a drug trafficker.

18          Your Honor, I ask God that all your knowledge allows

19  you to -- your knowledge and wisdom allows you to judge me

20  reasonably.  Please, your Honor, don't allow that your sole

21  calculations and math allows me to stay in jail one more day

22  than necessary.  I ask that judge enlighten you at this time

23  when my life and my family's life is in your hands.

24          THE COURT:  So I have a situation which the defendant

25  agreed and intended to engage in significant major drug

M6ABANES

1  trafficking, a situation in which he showed his willingness and

2  commitment by actually investing money into the transaction,

3  but I have a situation as well where there came a point and

4  perhaps it was that seizure of the kilograms in September of

5  2019 that triggered his reaction, but at some point he came to

6  regret what he had done.  He changed his mind about continuing

7  in that endeavor, and the government has no evidence that after

8  that point in time, after he left the city and returned to the

9  country side that he continued to assist the conspiracy or any

10 other drug conspiracy in any way.

11          So I have a record here of significant wrongdoing that

12 had a significant consequence.  It's more than an initial step.

13 It was the underwriting or partial underwriting of the sample

14 in a large scale transaction and then a withdrawal from the

15 conspiracy.  Not withdrawal in the technical legal sense of

16 notifying the authorities, but in the more personal sense of

17 disengaging from the conspiracy.  I think that sets him apart

18 from the co-conspirators I have already sentenced.  It's not so

19 much the scale of his participation which was significant, but

20 his decision not to continue in the conspiracy that I am

21 focusing on.

22          Also I have to take into account that the defendant to

23 this date has served time in custody when our prison facilities

24 have been challenged by the pandemic, and the steps that they

25 must take to try to keep the population in the prison and the

M6ABANES

1   staff who work in the prison safe has resulted in extraordinary

2   hardship for everyone in the facility.  The impact on the

3   family sadly is similar to the impact one sees in families day

4   in and day out when fathers, sons, brothers, choose to engage

5   in criminal activity that results in periods of incarceration.

6   Families lose their breadwinner.  They lose someone that they

7   care about deeply, so I put less emphasize on that,  But at the

8   same time not because I underestimate the pain and suffering

9   that has occurred here.  It is a natural consequence of the

10  defendant's own decisions.

11          Mr. Robledo, please stand.  I impose a sentence of 72

12  months imprisonment to be followed by no term of supervised

13  release.  I require the defendant to submit to a term of

14  incarceration.  I'm sorry, to submit to deportation and not

15  unlawfully reenter this country.  He shall pay a special

16  assessment of $200 dollars and a fine of $35,000. You may be

17  seated, Mr. Robledo.

18          Counsel, is there any legal reason why I cannot impose

19  the sentence I've described as stated?

20          MR. ROBLES:  No, your Honor.

21          MR. OSUNA:  No, your Honor, not from the defense.

22          THE COURT:  The sentence I've described on the record

23  will be imposed as stated.  Are there any open counts?

24          MR. ROBLES:  Your Honor, the government moves to

25  dismiss any open counts.

M6ABANES

1    THE COURT:  Your application is granted.  I need to

2    advise the defendant of his right to appeal.  If you're unable

3    to pay the cost of an appeal, you may apply for leave to appeal

4    *in forma pauperis*.  Any Notice of Appeal must be filed within

5    14 days of the judgment of conviction.  I am going to recommend

6    to the Bureau of Prisons that the defendant receive medical

7    treatment for a herniated disk and high blood pressure and any

8    other medical conditions that require attention.

9    Mr. Osuna, is there any other application?

10   MR. OSUNA:  I would ask that he be designated to a

11   facility close to New York so that his sister who lives in New

12   York, who's a United States citizen, could visit him and when

13   his family comes, they can visit him.  Something close to New

14   York Fort Dix or Danbury in Connecticut.  Thank you very much,

15   your Honor.

16   THE COURT:  I recommend to the Bureau of Prisons that

17   the defendant be designated to an institution as close to New

18   York City as possible.

19   Thank you, counsel.

20   (Adjourned)

21

22

23

24

25